UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RONNIE TOUPS                                    CIVIL ACTION

v.                                              NO. 14-2544

SYNTHES, INC.                                   SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is Synthes, Inc.'s motion for summary judgment.  For the reasons that follow, the motion is GRANTED.

<u>Background</u>

This product liability litigation arises out of injuries suffered by the plaintiff as a result of two allegedly defective medical devices implanted by two different surgeons.

On May 24, 2013, Ronnie Toups wrecked his motorcycle to avoid getting hit by a car that failed to stop at a stop sign.  As a result, he broke his collar bone and his wrist.  To treat this clavicle injury (a right distal mid-shaft clavicle fracture with displacement), Dr. Kevin Watson, an orthopedic surgeon, recommended an open reduction and internal fixation surgery, in which he would implant a metallic internal fixation device, which would help align the fractured bones while normal healing occurs.  The next day, Mr. Toups underwent the recommended surgery during which Dr. Watson implanted an eight-hole Synthes LCP clavicle plate with seven Synthes locking and cortex screws.  The Synthes generic package

1

insert is included in the package for each LCP plate.  According to
the product insert provided to the surgeon, clavicle plates are to
be used for fixation of fractures, malunions, and nonunions; the
generic product insert also contains a number of warnings directed
to the attention of the operating surgeon, including that "[t]hese
devices can break when subjected to the increased loading
associated with delayed union or nonunion."[1]  Dr. Watson had used
the Synthes-manufactured LCP plate before, had experienced positive
clinical results with the plate, and was of the opinion that the
plate was a safe and effective device.

One month after surgery, x-rays of Mr. Toups' right clavicle
showed "minimal callus formation or none," and x-rays six weeks
after surgery showed "some early callus" with no hardware failure.
X-rays ten weeks after surgery showed "some healing" that Dr.
Watson described as "slow."  Mr. Toups was allowed to return to
work.  More than four months after surgery, on October 3, 2012, Mr.
Toups was working offshore closing the lid on a toolbox, or pulling
a strap on a toolbox, when he felt a pop in his shoulder followed
by immediate and severe pain.  X-rays taken by Dr. Watson five days
later showed the stainless steel plate was broken in the area of
the bone fracture line.  Dr. Watson diagnosed failed hardware with

---

[1] In layman's terms, "nonunion" simply pertains to a
fractured bone that fails to heal properly.

nonunion.[2]    Because   Mr.   Toups   had   lost   his   health   insurance
coverage, Dr. Watson referred Mr. Toups to Dr. Paul Gladden at LSU,
where Mr. Toups was seen by a resident under Gladden's supervision
the   next   day.    The   diagnosis   was   "fracture   of   clavicle   with
nonunion."   A  few  weeks  later  on  October  29,  2012,  Dr.  Gladden
removed the broken plate and screws and performed tests to rule out
infection.    Dr.  Gladden  diagnosed  "right  clavicle  nonunion  with
broken  hardware";  the  surgery  confirmed  that  there  was  no  bone
healing:  "[t]here  did  not  appear  to  be  any  union  at  the  fracture
site, whatsoever. It was very unstable."

     After cultures came back negative for infection, Mr. Toups was
scheduled   for   a   revision   open   reduction   and   internal   fixation
surgery.   Mr.  Toups  was  warned  of  the  potential  risk  of  failure  or
breakage  of  internal  fixation.    On  November  28,  2012,  Dr.  Gladden
performed  open  reduction  with  internal  fixation  surgery,  at  which
time  he  implanted  a  Synthes  LCP  plate  identical  to  the  first  plate
along  with  eight  screws.    Like  Dr.  Watson,  Dr.  Gladden  had  used  the
LCP  plate  before  with  good  clinical  results,  and  he  believed  the
plate  was  a  safe  and  effective  medical  device.    Dr.  Gladden  agreed
that  the  Synthes  generic  package  insert  accurately  described  the
risks  associated  with  all  internal  fixation  devices,  including  the
LCP  plate,  agreed  that  one  such  risk  was  fatigue  failure  secondary

---

     [2]  Dr.  Watson  found  "it  unusual  for  this  plate  to  fail
early  in  the  course,  even  in  the  face  of  a  delayed  union,  without
having  some  type  of  traumatic  injury  to  it."

to nonunion or delayed union, agreed the implant race was a scientifically established principle, and agreed he was aware of it without any warning from Synthes.[3]  Dr. Gladden confirmed that the breakage of the first plate was consistent with nonunion, which is the most common cause of plate breakage, and that plate breakage does not necessarily mean that there is a design, material, or manufacturing defect in the plate.

In a follow-up visit seven weeks after surgery, x-rays showed minimal callus formation.  After a physical exam, upon Mr. Toups' request, on January 15, 2013, he was given a return to work slip. Mr. Toups was instructed to return to LSU in six weeks, but he did not return.  Instead, Mr. Toups went to Dr. Thomas Lyons on March 14, 2013 for additional evaluation and treatment.  X-rays taken by Dr. Lyons showed that Mr. Toups' clavicle bone appeared to be "well healed with consolidation of graft present although the bone is thin in the midportion of the clavicle shaft and mild lucency remains."  Mr. Toups had not returned to work since October 3, 2012.  Dr. Lyons allowed Mr. Toups to return to work as an operator.

Almost one year after the surgery in which the second Synthes plate was implanted, on November 6, 2013, Toups was at work using a drill that "got locked up and jerked his arm", when he felt a pop

---

[3] But it is not Dr. Gladden's practice to give patients such as Mr. Toups copies of the inserts packaged with Synthes clavicle plates.

in his shoulder, resulting in a steady onset of pain. X-rays
revealed that the second LCP plate was broken.

On November 19, 2013, Toups saw a third orthopedic surgeon,
Dr. Scott Habetz, who diagnosed "right clavicle, nonunion." Dr.
Habetz warned Toups of the risks of nonunion and hardware failure,
and potential hardware removal. Dr. Habetz agreed that the Synthes
generic package insert accurately described the risks associated
with all internal fixation devices, including the LCP plate, agreed
that one such risk was fatigue failure secondary to nonunion or
delayed union, agreed that nonunion is the most common cause of
plate breakage, and agreed that plate breakage does not necessarily
mean that there is a design, material, or manufacturing defect in
the plate.  On December 2, 2013, Dr. Habetz performed open
reduction fixation surgery, which confirmed the preoperative
diagnosis of "right clavicle, nonunion." Dr. Habetz removed the
Synthes hardware and implanted an Acumed-manufactured ten-hole
clavicle plate with nine screws, along with iliac crest bone graft
and Infuse artificial bone graft. X-rays taken more than ten weeks
after surgery showed no bone healing, and a bone stimulator was
ordered.

Mr. Toups last saw Dr. Habetz on August 13, 2014, when x-rays
showed that the fracture appeared to be healed. Mr. Toups has not
experienced any problems with the Acumed clavicle plate installed
by Dr. Habetz. On November 6, 2014, Mr. Toups sued Synthes, Inc.,

alleging various negligence claims as well as claims under the Louisiana Products Liability Act; he seeks to recover damages as a result of the allegedly defective Synthes-manufactured and designed clavicle plates.   Synthes now seeks summary relief on the ground that Mr. Toups cannot meet his burden to prove any claim, including any cause of action alleged under the four exclusive theories of liability permitted by the Louisiana Products Liability Act, La.R.S. 9:2800.51, *et seq*.

### I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.   No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.   See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).   A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.   See id.   Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.   Id. at 249-50 (citations omitted).   Summary judgment

is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2).  "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted).  In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II.

*A.*

Synthes first submits that any claim based on the May 29, 2012 surgery is prescribed on its face and, as such, the plaintiff bears the burden to establish why his claim against Synthes is not prescribed. The plaintiff has failed even to respond to Synthes' argument. Any claim based on the first plate is therefore prescribed.

A claim for damages arising from a defective product prescribes one year from when plaintiff sustains injuries. La. C.C art. 3492. "[A] plaintiff will be deemed to know that which he could have learned by reasonable diligence." Edmundson v. Amoco Prod. Co., 924 F.2d 79, 83 (5th Cir. 1991)(citation omitted). The relevant question is when the plaintiff possessed enough information through the exercise of due diligence, knowable to the plaintiff, to investigate his claim. Misitch v. Cordes Mfg. Co., 607 So.2d 955, 956 (La. App. 4 Cir. 1992). Synthes submits that Mr. Toups' cause of action was reasonably knowable at the latest by October 29, 2012, when the first plate was removed. The plaintiff filed this lawsuit on November 11, 2014, more than two years after: he felt a snap in his shoulder; returned to Dr. Watson on October 8, 2012; was told that the plate had broken; was allegedly told that the plate was defective; he underwent surgery to remove the broken plate on October 29, 2012; and he requested that he be given

the plate for legal reasons.  Any claim based on the first surgery
is prescribed on its face.  Because the plaintiff advances no
argument as to why any cause of action based on the allegedly
defective first plate is not prescribed, summary relief in favor of
Synthes is appropriate.  See Wimberly v. Gatch, 635 So.2d 206, 211
(La. 1994)(when the face of the complaint reveals that prescription
has run, the plaintiff bears the burden of showing why his claim
has not prescribed); see also Brown v. Our Lady of the Lake
Regional Medical Center, 803 So.2d 1135, 1137 (La. App. 1 Cir.
12/28/01)("Ordinarily, the burden of proof is on the party pleading
prescription; however, if on the face of the petition it appears as
if prescription has run, the burden shifts to the plaintiff to
prove a suspension or interruption of the prescriptive period.").
The plaintiff may only pursue his product liability claims arising
from the clavicle plate that failed on November 6, 2013.

*B.*

     Synthes next submits that Mr. Toups' non-LPLA claims are
barred and must therefore be dismissed.  The Court agrees.

     The Louisiana Products Liability Act (LPLA) provides the
exclusive remedy for products liability claims, or harm caused by
a manufacturer's product. La. R.S. § 9:2800.52; Demahy v. Schwarz
Pharm, Inc., 702 F.3d 177, 182 (5th Cir. 2012); Jefferson v. Lead
Indus. Ass'n, Inc., 106 F. 3d 1245, 1250-51 (5th Cir. 1997).  Thus,
it is clear that "[a] plaintiff may not recover from a manufacturer

for damage caused by a product on the basis of any theory of liability not set forth in the LPLA." La. R.S. § 9:2800.52. Moreover, even if an action under the LPLA is predicated on principles of strict liability, negligence, or warranty, these theories are not available as independent theories of recovery against the manufacturer.  Stahl v. Novartis Pharma. Corp., 283 F.3d 254, 261 (5th Cir. 2002).

Synthes contends that all of plaintiffs' claims other than those under the LPLA must be dismissed.  The plaintiff fails to respond to Synthes' exclusivity argument.  The statute is clear that the plaintiff's exclusive remedy lies with the LPLA.  Insofar as the plaintiff alleges claims outside the scope of the LPLA, those non-LPLA claims must be dismissed.

*C.*

Synthes submits that the plaintiff has no competent evidence to support his claims under the LPLA under any of the four available statutory theories of liability and, therefore, summary relief is appropriate.

Under the LPLA, a plaintiff must prove that (1) the defendant is the manufacturer of the product; (2) his injury or damage was proximately caused by a characteristic of the product; (3) this characteristic made the product "unreasonably dangerous"; and (4) the plaintiff's damage arose from a reasonably anticipated use of the product.  Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 261

(5th Cir. 2002).   A plaintiff may prove that a product is "unreasonably dangerous" only by establishing that it is so:  (1) in construction or composition; (2) in design; (3) due to inadequate warning; or (4) due to nonconformity to an express warranty.  Id.; La. R.S. § 9:2800.54(B)(1-4).  Synthes submits that Mr. Toups can prove none of these four theories.

    1.  No evidence of defect in composition or manufacture.

    First, Synthes submits that the plaintiff has no evidence to support his allegations that the plates "were unreasonably dangerous in composition and/or design because they materially deviated" from "specifications and/or performance standards."  The Court agrees.

    To be unreasonably dangerous in construction or composition, a product must have "deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer" when it left its manufacturer's control.  La.R.S. § 9:2800.55; Jenkins v. International Paper Co., 945 So.2d 144, 150 (La. App. 2 Cir. 11/15/06)("A claimant must demonstrate not only the manufacturer's specifications or performance standards for the particular product, but also how the product materially deviated from those standards so as to render it 'unreasonably dangerous.'").

    There is no evidence in the summary judgment record that

suggests that the clavicle plate was defective due to a mistake in the manufacturing process. Each of the plaintiff's physicians agree that a material or manufacturing defect cannot be inferred from breakage of a plate; that the most logical explanation of plate breakage is nonunion. Nevertheless, the plaintiff submits that an issue of material fact exists as to whether or not the plate met Synthes' quality control, certification, and recertification requirements at the time the clavicle plate left Synthes' control. He relies on his expert metalurgical engineer, Thomas Shelton, Ph.D., who concluded that the Synthes clavicle plate removed from the plaintiff's shoulder on December 2, 2013 "failed by a fatigue fracture mechanism. The physical evidence indicated that the loads applied to the plate were low and significantly below the yield strength of the material." The plaintiff submits that Dr. Shelton was not able to compare the composition of the clavicle plate with Synthes' internal specifications. However, the plaintiff only selectively cites portions of his expert's deposition. The complete record betrays the plaintiff's position. In fact, Dr. Shelton admitted that he reviewed the raw material and manufacturing records, as well as the design drawing for the LCP plate. Although Dr. Shelton indicated in his report that he was not provided with the design specifications for the plate, he admitted in his deposition that he was provided with the design drawing and that the dimensions of the

plate met the design drawing specifications.

> Q.   And then under section 6 you talk about dimensions and you say that dimensional specifications were not included. What was it you were looking for that you didn't see included?
>
> A.   Actually I found it later the – your schematics and drawings.
>
> Q.   Were you able to after you prepared your report compare the plate to these drawings and determine whether or not the dimensions were met, the specifications and the drawings?
>
> A.   Again, I did not do a detailed analysis, but I did check the area in which the fracture occurred and they appeared to meet the specifications.

Contrary to the plaintiff's characterization, Dr. Shelton testified that the plate passed Synthes' quality control inspection, as well as certification and recertification. Dr. Shelton offers no opinion that the plates deviated in a material way from the specifications or performance standards for the plates, or deviated from other Synthes plates; he agreed that the plate appeared to meet the applicable standards, that the dimensions met Synthes' specifications, that the plate passed Synthes' quality control inspection, and that the plate passed certification and recertification. That Dr. Shelton testified that additional testing is needed to determine if there is a material or manufacturing defect fails to defeat Synthes' supported motion. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 proper if the party opposing the motion fails to establish an essential element of his case.). A statement by the plaintiff's expert that a defect

"cannot be ruled out" is insufficient to withstand summary judgment. Such an opinion does not alter the fact that there is nothing in the summary judgment record to support a claim that the plate was unreasonably dangerous due to a defect in the manufacturing process. Given the absence of evidence of a material or manufacturing defect, summary judgment in Synthes' favor is appropriate.

2. No evidence of design defect.

Synthes submits that there is no evidence to support any claim that the plate was unreasonably dangerous due to a design defect. Although the plaintiff alleges in his complaint that the plates were unreasonably dangerous in design, he advances no response to Synthes' argument that the plaintiff has presented no proof to establish an alternative design.

The LPLA defines when a product is unreasonably dangerous in design:

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturerer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

La.R.S. § 9:2800.56; <u>McCarthy v. Danek Medical, Inc.</u>, 65 F. Supp. 2d 410, 412 (E.D. La. 1999)("Without expert or technical evidence to support the contention that the design was defective or to establish an alternative design, plaintiff has failed to create an issue of fact to be left to a jury."). Here, the plaintiff has presented no evidence that there existed an alternative design for the clavicle plate. The surgeons who implanted and explanted the plates testified that the plates were safe and effective products, and that plate failure does not mean that the design is defective. Dr. Habetz in particular testified that the plate broke because of nonunion and that all hardware will break if the bone does not heal. Because there is no evidence to support a claim that the LCP plate design was defective, or to establish an alternate design, summary judgment is appropriate.

3.   No evidence of inadequate warning.

Synthes submits that the plaintiff's inadequate warning claim must fail for three reasons. First, the generic package insert warned of the possible adverse effects associated with the use of the LCP plate system, including the potential for fatigue breakage, additional surgery, and continued pain and discomfort. The generic package insert warned of the specific risk involved here: "These devices can break when subjected to the increased loading associated with delayed union or nonunion." Second, the plaintiff cannot show causation between the failure to warn and the

plaintiff's injury; there can be no causation when the failure to warn involves a risk that does not occur or is already known in the medical community.  Third, a manufacturer has a duty to warn only the prescribing physician, not the patient, of the risks of a prescription drug or device.  The plaintiff suggests that Synthes did not warn the plaintiff directly and failed to warn the surgeons about LCP plate load cycles.

The plaintiff offers no evidence in support of an inadequate warning claim.  The plaintiff does not dispute that the record shows that the Synthes generic package insert warned of the possible adverse effects, including that the device can break "when subjected to the increased loading associated with delayed or nonunion."  The plaintiff's surgeons agreed that the insert accurately describes the risks associated with orthopedic fixation devices such as the LCP plate.  Moreover, Synthes is not liable under the LPLA for failure to warn when "the user or handler of the product already knows or reasonably should know of the characteristics of the product that may cause damage and the danger of such characteristics." La.R.S. § 9:2800.57(B)(2).  To prevail under a failure to warn theory, the plaintiff must show that (1) Synthes failed to warn the doctors of a risk associated with the device "not otherwise known to the physician;" and (2) this failure to warn was both a cause in fact and proximate cause of the plaintiff's injury.  <u>Willett v. Baxter Intern., Inc.</u>, 929 F.2d

1094, 1098-99 (5th Cir. 1991).  Here, the plaintiff offers no proof of either element.  The record shows that the plaintiff's surgeons[4] were aware of all material risks associated with the LCP plate, including fatigue failure secondary to nonunion. Summary judgment dismissing the failure to warn claim is appropriate.

4.  No evidence of an express warranty.

Finally, Synthes seeks to dismiss the plaintiff's claim that it breached an express warranty "to the general public and the medical community" that the LCP plates were "suitable and safe for use."  The plaintiff fails to mention any express warranty claim in its opposition papers.

Under the LPLA, a plaintiff may claim that a product is unreasonably dangerous if the product "does not conform to an express warranty made at any time by the manufacturer" and the warranty "has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue."  La.R.S. § 9:2800.57(A). If there is nothing in the record to indicate the existence of an express warranty, summary judgment dismissing a claim based upon the failure to conform to an express warranty is appropriate.  Clay

---

[4]  Under Louisiana's learned intermediary rule, a manufacturer warns only the prescribing physician, not the patient, of the risks of a prescription drug or device.  It is the plaintiff's burden to show that the warning was inadequate because it did not inform his surgeon of a material risk not already known to the surgeon.  McCarthy, 65 F. Supp. 2d at 413.

v. Int'l Harvester Co., 674 So.2d 398, 412 (La. App. 3 Cir. 5/8/96).  There is no evidence in the record as to any express warranty made by Synthes.  Accordingly, summary judgment dismissing the plaintiff's claim that the plate failed to conform to an express warranty is warranted.

<em>D.</em>

Finally, the Court addresses two remaining arguments that the plaintiff advances in an effort to withstand summary judgment.

1. Circumstantial Evidence

The plaintiff submits that the circumstantial evidence presented in this case presents a genuine issue of material fact that should be presented to the jury.  That is, the plaintiff submits that the record shows that Mr. Toups had two Synthes 8 hole clavicle plates fixated to his collar bone by two different orthpedic surgeons at two different hospitals.  And both failed. These facts alone may persuade a reasonable jury that the Synthes plates were unreasonably dangerous due to manufacturing defects. The Court disagrees.

The plaintiff cites no authority for his *res ipsa loquitur* argument under the circumstances presented here.  In fact, the authority is to the contrary: the mere fact that a product fails is not evidence of a defect, and a plaintiff cannot rely on such circumstantial evidence when direct evidence was available.  See Lawson v. Mitsubishi Motor Sales of America, Inc., 938 So.2d 35, 43

(La. 2006)(acknowledging that *res ipsa loquitur* doctrine may be used in product liability cases, but finding it inapplicable to the facts of the case presented).  Here, all three of the plaintiff's surgeons testified that plate breakage does not mean that the plate has a manufacturing defect.  In fact, the summary judgment record suggests that one of the most probable explanations for plate breakage is nonunion -- notably, the diagnosis given by the plaintiff's surgeons -- not a plate defect.  Accordingly, the plaintiff has failed to persuade that the doctrine of *res ipsa loquitur* precludes summary judgment.

    2.  Discovery

    Finally, the plaintiff alternatively urges the Court to deny the defendant's motion pursuant to Rule 56(d) because discovery is incomplete.  The plaintiff suggests that Synthes has not yet submitted its expert reports, which plaintiff submits leaves him unable to present facts sufficient to justify opposition to Synthes' motion.  Notwithstanding that Rule 56(d) motions are "broadly favored and should be liberally be granted", <u>Raby v. Livingston</u>, 600 F.3d 552, 561 (5th Cir. 2010), the plaintiff's request is denied.

    The rule provides:

(d) When Facts Are Unavailable to the Nonmovant.

    If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

> (1)   defer considering the motion or deny it;
> (2)   allow time to obtain affidavits or declarations or to take discovery; or
> (3)   issue any other appropriate order.

FED. R. CIV. P. 56(d).  Thus, the Rule 56(d) movant "must set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion."  McKay v. Novartis Pharmaceutical Corp., 751 F.3d 694, 700 (5th Cir. 2014)(citing Raby, 600 F.3d at 561)); Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1267 (5th Cir. 1991)("The nonmoving party must show how the additional discovery will defeat the summary judgment motion, that is, will create a genuine dispute as to a material fact, and may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.")(internal quotation and citation omitted).

The plaintiff has failed to comply with Rule 56(d).  First, he submits no affidavit or declaration in support of his request for additional discovery to overcome Synthes' summary judgment motion.  Second, he fails to specify what facts might exist, let alone articulate a plausible basis for believing how any adduced facts would influence the outcome of Synthes' summary judgment motion.  All that plaintiff suggests is that he is awaiting the defendant's expert reports.  But he fails to explain how any potential defense expert would assist the plaintiff in his obligation to put forth

evidence supporting the essential elements of his LPLA claims.[5] Without any indication by the plaintiff how a defense expert could assist him in adducing proof for his case, the plaintiff fails to persuade the Court that it must deny, or defer ruling on, the defendant's summary judgment motion.

* * *

Accordingly, for the foregoing reasons, the defendant's motion for summary judgment is GRANTED.  The plaintiff's claims are hereby dismissed.

New Orleans, Louisiana, November 4, 2015

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[5] The defendant submits that the plaintiff has not been diligent in pursuing discovery, noting that the plaintiff made no effort to take any discovery until 35 days before the discovery cutoff.  This further supports denial of the plaintiff's request for additional time to conduct discovery before ruling on the summary judgment motion.  McKay, 751 F.3d at 700 ("If the requesting party 'has not diligently pursued discovery . . . []he is not entitled to relief' under rule 56(d).")